**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

**MARK BEAUCHENE**                                                          **PLAINTIFF**

**v.**                                                          **Cause No. 3:12-CV-784-CWR-LRA**

**MISSISSIPPI COLLEGE and**                                            **DEFENDANT**
**JOHN DOES 1-10**

## <u>ORDER</u>

The above-styled matter is before the Court on Defendant's Motion to Dismiss, or in the alternative, Motion for Summary Judgment. Docket No. 4. Plaintiff has responded in opposition [Docket No. 7] and Defendant has submitted a rebuttal [Docket No. 9]. Having carefully considered the parties' motions, their opposition thereto, applicable case law, and being otherwise fully advised in the premises, the Court orders that Defendant's motion be granted.

### I. Background

This cause arose from sanctions that were imposed on Plaintiff Mark Beauchene by Defendant Mississippi College School of Law (hereinafter "MC Law")—mainly a suspension and an eventual expulsion—for committing multiple acts of plagiarism in violation of section VIII(C) of its Student Honor Code entitled, "*Inappropriate Use of the Work of Others*."[1] *See*

---

[1] Section VIII(C) defines a violation of plagiarism as follows:

> Using the words, thoughts, or ideas of another without attribution consistent with legal citation manuals (e.g., *ALWD Citation Manual* or *Bluebook*). . . The most blatant forms include copying someone else's work word-for-word . . . Other examples include rewriting someone else's work with only minor changes, or summarizing another's work or taking another person's ideas without acknowledging the source through proper attribution and citation.

*Id*.

1

Docket No. 1, at 4.[2] After he was expelled, Beauchene filed this action on November 16, 2012, asserting claims of breach of contract and intentional and negligent infliction of emotional distress, and demanding compensatory and punitive damages. Docket No. 1, at 9-13. He also included in his complaint a motion for preliminary and permanent injunctive relief, which he has since abandoned. Docket No. 1, at 13.

A. *First Act of Plagiarism*

In the Spring semester of 2012, Beauchene submitted a research paper as part of a writing requirement under the supervision of Professor Cynthia Nicoletti. Docket No. 1, at 3; Docket No. 5, at 7. Nicoletti was displeased with his submission, ostensibly because of the blatant plagiarism it contained. *Id*. On March 8, 2012, Nicoletti submitted to Professor Matt Steffey, the Honor Code Advisor, a copy of Beauchene's paper with her handwritten notations describing her findings of plagiarism and a copy of the article she believed to have been plagiarized. Docket No. 4-1, at 4 ("Affidavit of Matt Steffey"). *See also* Docket No. 4-2, at 3 ("Affidavit of Cynthia Nicoletti") ("I . . . concluded that [Beauchene's paper] contained multiple instances of plagiarism and the inappropriate use of the work of another."). That same day, Beauchene received an email from Steffey seeking to schedule a meeting the following afternoon, after which Beauchene inquired as to what the meeting would entail so that he could prepare. Docket No. 1-1, at 1-2. In reply, Steffey stated, "[N]o worries. [N]o need to prep[are]." Docket No. 1-1, at 2. They agreed to meet the following day. *Id*.

During the more than two hour meeting, Steffey and Beauchene discussed what Steffey believed to have been obvious plagiarism and clear violations of the Honor Code, and the

---

[2] MC Law erroneously numbered this portion as section "VIII" in the text of the Honor Code, when it is actually preceded by section VI. Docket No. 1-1, at 50. In order to be consistent, this Order will continue to use the Roman Numeral VIII when referring to this section.

consequences that Beauchene would face for the infractions. *See* Docket No. 11, at 3; Docket No. 1-1, at 7.

On March 14, Steffey sent an email to Beauchene offering him the option to have his paper reviewed by law faculty at another institution. If, after that blind evaluation, the reviewers found no plagiarism, the matter would be dismissed. However, if the review concluded there was plagiarism, Beauchene would be expelled. Docket No. 1-1, at 3. Beauchene turned down that option. In an email to Steffey, he explained:

> I don't think sending my paper to another institution is necessary. I want [you to] know I am taking a thorough review of my paper and that I plan to get back to you with a detailed response and my response will demonstrate that I understand the magnitude of what I did.

*Id*. Beauchene also declined to appeal to the Honor Court.[3] *See* Docket 1-1, at 12.

Later that day, in a letter to Steffey, Beauchene provided a more detailed response. In it, he acknowledged, among other things, that what he did "was wrong"; that he "failed to uphold the standards of the Honor Code"; that some of his acts were improper; and that he violated the Code's prohibition against plagiarism.[4] *See* Docket No. 4-11. He also acknowledged that the

---

[3] Under Section XI of the Student Honor Code, Beauchene had a right to Appeal the decision of the Advisor to the Honor Court. Docket No. 1-1, at 59. These proceedings, as described in the Honor Code, mirror conventional courtroom proceedings: there is a notice of appeal, a pre-hearing procedure, discovery and motions, a hearing, a ruling, and an opportunity to have the decision reviewed by the Dean. *Id*. The Dean's review is discretionary and is "limited to a determination that the process has been fundamentally fair and that an appropriate sanction has been imposed." *Id*. at 60. The Honor Code does not provide for a review by faculty from another institution.  It is not clear from the record why that was offered, but it appears that such an option would provide even more protection to Beauchene.

[4] In addition to admitting guilt, Beauchene gave specific examples of how he plagiarized:

> I obtained four of my citations, notes 1, 10, 19, and 22, directly from the Anger Comment, notes 16, 26, 47, and 52. This was improper. . . . I took two quotations from primary sources from the Anger Comment at notes 18 and 41. . . . At points in the introductory section of my draft, I used the Anger Comment in part as a source of primary authorities, to interpret those authorities, and to identify material language in those authorities. Having done so, I ought to have indicated this use of the Anger Comment by proper citation. I failed to do so.

Code authorized a range of sanctions, but he offered to cooperate and implored Steffey to not sanction him "in a manner that will substantially impair [his] opportunity to pursue a career in law." *Id*.

After considering Beauchene's written statement, conferring with faculty and staff, and meeting with Beauchene a second time on March 20, *see* Docket No. 1-1, at 15, Steffey issued an exhaustive memorandum to Beauchene detailing the matter of plagiarism discussed in their March 9 meeting, the portions of the Honor Code which were breached, and the sanctions to be imposed. *See* Docket No. 1-1, 5-12.[5] Steffey explained, in part:

> The first 25% of your paper, for starters, is taken line-by-line and footnote-by-footnote from a single source . . . yet you cite that source nowhere in your paper. . . . [Y]our basic approach was to use a computer to 'copy, paste, edit'; that is, you copied text and footnotes from [the] article and other sources, changed the text slightly, and retained the footnotes *verbatim*  . . . .
>
> . . . .
>
> In sum: you actually wrote very little of what you submitted as your paper. Instead, the great bulk of you[r] paper consists of a 'copy, paste, edit' process, whereby you [ ] copied the published work of various authors; pasted it into your submission with little or no attribution; and merely edited the material so that the text is slightly paraphrased and the authors' footnotes are retained verbatim.

*Id*. at 7-8, 10. Among the numerous sanctions to be imposed, Beauchene was permanently suspended from the law school effective immediately. No earlier than the Fall semester of 2012, however, he would have the right to petition to have his suspension lifted. *Id*. at 10. If he were successful in having his suspension lifted, Beauchene would have to retake the course under the supervision of and as directed by a different instructor, Professor Cecile Edwards. *Id*. at 11. As

---

*Id*.

[5] This memo reveals that Steffey and Beauchene had an additional meeting on March 20. During this meeting, Beauchene discussed the reasons for his actions and attempted to explain that he did not realize his actions constituted plagiarism at the time. Docket No. 1-1, at 7-8.

for the course in which he submitted the plagiarized writing, Beauchene would receive a failing grade, in the discretion of Professor Nicolleti. *Id*. With respect to the remaining courses in which he was currently enrolled, Beauchene would receive a grade of "W." *Id*.

The memo also reminded Beauchene that he had declined his right to either have the matter reviewed by the Honor Court, *see id*. at 12,[6] or have his paper reviewed by faculty from another law school. *Id*. at n.6. Steffey, however, gave Beauchene until March 30 to change his mind and seek review. If Beauchene did not accept this offer, the sanctions imposed, including but not limited to suspension, would be final. *Id*.

The memo prompted a string of emails between Beauchene and Steffey from March 28 through March 30. Steffey assured Beauchene that his suspension was final, but he could meet with Dean Rosenblatt to discuss how he may have his suspension lifted in the future. Before meeting with the Dean, however,  Beauchene could submit a written statement to him raising any disputes regarding the facts stated in the memo. Additionally, through one of the emails, Beauchene requested a ten working-day extension to seek Honor Court review, but Steffey denied the request and kept the deadline at March 30. Docket No. 1-1, 12-17.

On April 2, 2012, Beauchene sent a two-page apology letter in which he characterized his violations as mistakes. Docket No. 4-14. He also used the letter to attack Professor Steffey about how Steffey had treated him and to complain that the procedures of the Student Honor Code had not been followed. *Id*. at 2. He closed his letter with the following:

> I beg to be allowed to finish my off campus externship with the Army National Guard. I respectfully and mercifully ask however, that I not be sanctioned in a manner that will impair my opportunity to pursue a career in law, or with JAG.

---

[6] Had Beauchene sought review by the Honor Court, the Court could (1) decline to affirm the determinations of violations; (2) affirm the violations and recommend imposition of lesser or greater sanctions; or (3) affirm the determination of violations and sanctions.  Docket No. 1-1, at 12.

*Id.*

The following day, on April 3, Beauchene met with Rosenblatt and Steffey. Docket No. 1, at 12; Docket No. 4-16. After the meeting, Steffey issued a revised memo to Beauchene, which was reviewed and approved by Rosenblatt, setting forth his findings and the final sanctions that would be imposed. Apparently Rosenblatt was swayed by Beauchene's plea because the final Memo, although in most respects was the same as the first Memo, included a modified Sanction No. 8, which imposed a grade of "W" for all of his courses "with the exception *only* of [his] externship with the Army National Guard." Docket No. 1-1, at 24. (emphasis in original). As in the first memo, Steffey extended to Beauchene another opportunity to seek review by the Honor Court by April 4, and the memo once again noted that Beauchene turned down the opportunity to have his paper reviewed by faculty from another law school. *Id.* at 25.

After receiving the memo, Beauchene wrote a letter expressing contrition for his wrongdoing and accepting all sanctions, including the path for readmission as described in Steffey's memo. *See* Docket No. 4-16 ("I truly do understand my errors and the gravity of them as well as the fact that I need some personal growth . . . I look forward to completing the assigned sanctions to not only show my contrition and acknowledgment of wrongdoing but also to demonstrate my desire to positively move forward with my legal career. I know that I will return to school in the fall as a better person and strong student. . . . I have made mistakes, but now moving forward it is my duty . . . to develop into a better person and lawyer.").

*B. Second Act of Plagiarism*

After satisfying the requirements set forth in the conditions for readmission, *see* Docket No. 1-1, at 23-4, Beauchene resumed his studies in the Fall semester of 2012 as a student on disciplinary probation.[7] *See id.* at 26.

By October, Beauchene's legal education at MC Law was in serious jeopardy because he was accused of plagiarism again. *See* Docket 1-1, at 36. This time, as part of his required writing course under Professor Cecile Edwards, Beauchene submitted a draft paper pregnant with passages unaccompanied by proper attribution. In a string of emails, Edwards chided Beauchene for not citing references and scheduled a meeting for them to discuss his paper. Docket No. 1-1, at 27-30.[8] That meeting, which Steffey also attended, occurred on October 24, 2012. *See* Docket No. 1-1, at 36. A second meeting between Steffey and Beauchene occurred on October 29, 2012, whereupon they fully discussed the matter and the serious implications for Beauchene. *See* Docket No. 1-1, at 35.

Following the meeting, Steffey delivered a memo to Beauchene regarding his subsequent violations. *See* Docket No. 1-1, at 42.[9] The findings contained within this memo were strikingly similar to those made the prior semester:

---

[7] Beauchene was notified that as a student on disciplinary probation, he would be held to strict compliance of the Student Honor Code; otherwise, any "subsequent violation of the Honor Code or failure to comply fully with these sanctions, [would] be grounds for immediate expulsion from law school." Docket No. 1-1, at 24.

[8] Despite having had his topic since August 18, by October 9, Beauchene had done nothing. In an email to Beauchene, Edwards stated: "I am appalled at what you sent me today . . . . You have not done what you said you would do or what is expected of a third-year law student. Either you have not done enough work, or you simply do not have the skills needed to be a lawyer. I am extremely concerned about your work ethic." Docket No. 4-18. Edwards lamented, "Even with a draft due tomorrow, you have no paper at all. You have not written anything." *Id.*

[9] The memo stated, in addition to violations of plagiarism, Beauchene was being punished for "failing to seek clarification" from his professor to ensure proper attribution, and for being dishonest about his conduct in the meeting on October 24. "Importantly," the Memo explained, Beauchene committed these violations "while on disciplinary probation, following a suspension and other sanctions for similar violations." Docket No. 1-1, at 36.

7

I have determined that great portions of the papers you submitted embody examples of the foregoing type of academic misconduct. I have also determined that you lied about and misrepresented your work during our meeting with the course professor on Wednesday, October 24, 2012.

. . . .

. . . [I]n submitting your writing requirement paper this semester, you once again committed significant and serious acts of plagiarism. As before, you used a computer to 'copy and paste' text from various Internet sources. And, as before, you used this work of other authors without proper attribution to the true source of the text. **Indeed, long passages of your paper are taken word-for-word from uncited internet sources *without any attribution whatever*** [sic].

. . . . Given your prior suspension for this same conduct, and the clear and unambiguous instructions and warnings from the course professor orally and in writing, this lack of candor only confirms a culpable state of mind. Indeed, given the extent of the plagiarism, and the nature of some of the plagiarized sources, the only credible conclusion is that your misconduct was fully willful, and taken with full knowledge that it constituted academic dishonesty of the 'most blatant' form as described by the Honor Code.

Docket No. 1-1, at 38-39 (emphasis in original).[10] As a consequence, Beauchene was expelled. He was also notified that because this was a revocation of his probationary status, there was "no further review of this decision as a matter of right." *Id*. at 41.

Despite having no right to seek review, Rosenblatt granted Beauchene's request to meet with him. *Id*. at 43. In light of the scheduled meeting, Steffey exercised his discretion as advisor and suspended the imposition of the sanctions of expulsion and withdrawal, which allowed Beauchene to attend class while he sought review of the Dean. *Id*. at 42. On November 5, 2012, Beauchene met with Dean Rosenblatt, Associate Dean Phillip McIntosh and Professors Edwards and Steffey, during which time he expressed his dissatisfaction of being accused of plagiarism and the process in which the matter was handled. *Id*. at 43. Two days later, Dean Rosenblatt

---

[10] In contrast to the Memo from the previous semester, which included a list of thirteen sanctions, this one carried only three: (1) expulsion; (2) a failing grade for the special projects course under Professor Edwards; and (3) a grade of "W" for the other law courses in which Beauchene was currently enrolled. Docket No. 1-1, at 40.

furnished a memo to Beauchene stating that the sanctions set forth in Steffey's memo would be duly imposed. Docket No. 1-1, at 43. Specifically, Rosenblatt explained that in consideration of the matters Beauchene raised at the November 5 meeting, together with the letter Beauchene had provided and Steffey's Memorandum, the sanctions were appropriate. *Id*. He also informed Beauchene that the sanctions would be imposed immediately; thus, he could no longer attend classes.  *Id*. He was expelled.

In a November 8, 2012 email to Associate Dean McIntosh, Beauchene requested an appeal pursuant to Section XI of the Honor Code. Docket No. 1-1, at 44.[11] Subsequently, on November 14, 2012, Dean McIntosh denied his appeal and informed Beauchene that Dean Rosenblatt's decision, as articulated in his November 7, 2012, memo, was final. Docket No. 1-1. at 46. This lawsuit followed.

## II. Standard of Review

### A. *Motion to Dismiss*

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqubal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). The complaint must contain "more than an unadorned, the defendant-unlawfully-harmed-me accusation," but need not have "detailed factual allegations." *Id*. (citation and quotation marks omitted). The plaintiff's claims must also be plausible on their face, which means there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The Court need not accept as true

---

[11] Section XI(A) of the Student Honor Code states that "[a] student who has been sanctioned by the Advisor may, as of right, appeal the sanction and the Advisor's findings to the Honor Court." *Id*.

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (citation omitted).

Since *Iqbal*, the Fifth Circuit has clarified that the Supreme Court's "emphasis on plausibility of a complaint's allegations does not give district courts license to look behind those allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n.44 (5th Cir. 2011).

B.  *Motion for Summary Judgment*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) (citations and quotation marks omitted).

The Court must "view the evidence and draw reasonable inferences in the light most favorable to the non-movant." *Maddox v. Townsend and Sons, Inc.*, 639 F. 3d 214, 216 (5th Cir. 2011) (citation omitted). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co.*, 276 F.3d at 759 (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

Because Beauchene has invoked this Court's diversity jurisdiction pursuant to Title 28, Section 1332 of the United States Code,[12] the applicable substantive law is that of the forum state, Mississippi. *Capital City Ins. Co. v. Hurst*, 632 F.3d 898, 902 (5th Cir. 2011); *Smith v.*

---

[12] Beauchene is a resident of Arizona. MC Law is part of Mississippi College, a coeducational liberal arts institution located in Clinton, Mississippi. Docket No. 1.

*Goodyear Tire & Rubber Co.*, 495 F.3d 224, 228 (5th Cir. 2007). State law is determined by looking to the decisions of the state's highest court. *St. Paul Fire and Marine Ins. Co. v. Convalescent Services, Inc.*, 193 F.3d 340, 342 (5th Cir. 1999).

### III. Discussion

In response to Defendant's motion, Plaintiff invokes the provision in Rule 56 and attaches his affidavit required by the Rule. Docket No. 7-1. Rule 56(d) states:

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). "Rule 56(d) motions are generally favored and should be liberally granted, but the movant must demonstrate (1) why he needs additional discovery, and (2) how the additional discovery will likely create a genuine issue of material fact." *Chenevert v. Springer*, 431 F. App'x 284, 287 (5th Cir. 2011). A review of the record shows that the Court has sufficient information to rule on Defendant's motion. Plaintiff has not demonstrated how discovery may reveal evidence which creates a genuine issue of material fact. Thus, there is no need to defer ruling on the motion.

*A. State Tort Law Claims*[13]

MC Law's arguments as to Beauchene's state tort law claims will be reviewed under the motion to dismiss standard.

---

[13]   Lawsuits stemming from actions taken by university officials for alleged plagiarism have been premised upon the theories of defamation, violation of due process, breach of contract, negligence, promissory estoppel, intentional infliction of emotional distress and the First Amendment. *See generally*, Latourette, *Plagiarism: Legal and Ethical Implications of the University*, 37 J.C.U.L. 1, 53 (2010) (hereinafter "Plagiarism"). In this case, the only claims brought by Beauchene are negligent and intentional infliction of emotional distress, defamation and breach of contract, which, in turn, will be discussed below.

*1. Intentional and/or Negligent Infliction of Emotional Distress*

To assert a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant's conduct is "wanton and willful" and that it evoked "outrage or revulsion." *Speed v. Scott*, 787 So. 2d 626, 630 (Miss. 2001) (citation and quotation marks omitted). A claim for intentional infliction of emotional distress is difficult to prove, as the Fifth Circuit Court of Appeals explained:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*

*Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 548 (5th Cir. 1996) (citation and quotation marks omitted).

Beauchene has not pled any facts showing that MC Law's actions meet the high standard required to maintain an intentional infliction of emotional distress claim in Mississippi. In his complaint, Beauchene merely provides one statement, claiming, "[b]y its actions, omissions, and extreme and outrageous conduct, MC Law defamed and has intentionally and negligently inflicted emotional distress upon him." Docket No. 1, at 13. In his brief, Beauchene argues that he has properly set forth a cognizable claim of intentional infliction of emotional distress through his allegations that MC Law's denial of his due process protections was intentional and that Professor Steffey "yelled at [him] and berated him with vulgarity." Docket No. 8, at 9 ("Memo. of Auth. in Supp. of Resp. in Oppos. to Defendant's Mot. to Dismiss or in the Alternative, Mot. for Summ. Judgment"). He further claims that the wrongful expulsion constitutes a medically cognizable treatable injury. *Id.* Even taking these allegations into consideration, the Court finds

that Beauchene has failed to state a claim. These allegations do not meet the tall order of alleging a claim for intentional infliction of emotional distress. *See*, *e.g.*, *Jones v. Tyson Foods, Inc.*, 4:10cv11, 2013 WL 4876373, at *7 (N.D. Miss. Sept. 11, 2013) ("Conduct that rises to the level of nervewracking, upsetting, and even improper is not enough to reach the level of extreme and outrageous conduct required for recovery for intentional infliction of emotional distress.") (citations and quotation marks omitted); *Speed*, 787 So.2d at 630 (employer's repeated references to plaintiff as liar and thief did not constitute claim for IIED); *Haun*, 81 F.3d at 548 (conduct which was not praiseworthy and even wrongful was not so extreme as to rise to the level to support claim for IIED); *Smith v. Wesley Health Sys.*, *LLC*, No. 2:05cv2179, 2006 WL 2404566, at *2 (S.D. Miss. Aug. 18, 2006) (where employee was singled out to perform undesirable tasks and falsely accused of mistakes did not state claim for IIED).

Beauchene also has not stated a claim for negligent infliction of emotional distress. "Unlike the tort of intentional infliction of emotional distress, a plaintiff may not recover for a claim of negligent infliction of emotional distress without showing that he or she suffered a physical injury." *Hambrick v. Bear Stearns Residential Mortg.*, Civil Action. No. 1:07CV258-P-D, 2008 WL 5132047 (N.D. Miss. Dec. 5, 2008). As the Mississippi Supreme Court explained in *Illinois Cent. R.R. Co. v. Hawkins*,

> [m]ental anguish is a nebulous concept and requires substantial proof for recovery. Further, if the case is one of ordinary garden variety negligence, the plaintiffs would have to prove some sort of injury, whether it be physical or mental.  If the conduct was not malicious, intentional or outrageous, there must be some sort of demonstrative harm.

830 So. 2d 1162, 1174 (Miss. 2002) (brackets, citations and ellipses omitted). Beauchene does not allege that he suffered any physical injuries as a result of Defendant's actions. Therefore, his claim for negligent infliction of emotional distress too must be dismissed.

13

2. *Defamation*

In order to prove defamation, Beauchene must show: "(1) a false and defamatory statement concerning plaintiff; (2) unprivileged publication to third party; (3) fault amounting at least to negligence on part of publisher; (4) and either actionability of statement irrespective of special harm or existence of special harm caused by publication." *Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998) (citations omitted). As previously stated, Beauchene provided *only one* statement asserting that MC Law defamed him. MC Law correctly argues that like the claim for intentional and negligent infliction of emotional distress, Beauchene's defamation claim is conclusory.

It appears that Beauchene contends that MC Law has defamed him by asserting that he confessed to intentional plagiarism. *See* Docket No. 7-1, at 2 ("Contrary to the defendants' assertions, I did not confess to intentional plagiarism at any time."). The only publication about which Beauchene must be asserting are those which are included in the arguments presented in MC Law's papers requesting relief from this Court. But, "[s]tatements made in connection with judicial proceedings, including pleadings, are, if in any way relevant to the subject matter of the action, absolutely privileged and immune from attack as defamation, even if such statements are made maliciously and with knowledge of their falsehood." *Central Healthcare Serv.*, *P.A. v. Citizens Bank of Philadelphia*, 12 So.3d 1159, 1168 (Miss. Ct. App. 2009) (citation omitted). To the extent that Beauchene is asserting that accusations of plagiarism made by his professors, the Honor Code Advisor and the Dean constitute defamation, that contention must also be rejected. The communications made by, among and between these individuals concerning Beauchene's alleged plagiarism are shielded by qualified privilege.

> A communication made in good faith and on a subject-matter in which the person making it has an interest, or in reference to which he has a duty, is privileged if

> made to a person or persons having a corresponding interest or duty, even though it contains matter which without this privilege would be slanderous, provided the statement is made without malice and in good faith.

*Smith v. White*, 799 So.2d 83, 86 (Miss. 2001) (quoting *Louisiana Oil Corp. v. Renno*, 173 Miss. 609, 618-19, 157 So. 705, 708 (1934)).

The faculty members and the Dean had an educational responsibility to make sure that Beauchene was meeting its academic standards without resorting to plagiarism. It was their duty to report, investigate and impose discipline for the violations. Universities have the highest obligation to ferret out such conduct because when an academic institution confers a degree, it is certifying to other academic institutions, the private and public sector and the world at large that a student has met the academic standards of the institution. *See generally*, Mary Ann Connell & Donna Gurley, *The Right of Educational Institutions to Withhold or Revoke Academic Degr*ees, 32 J.C. & U.L, 51, 51-52 (2005). These communications are protected by qualified privilege. Therefore, Beauchene has failed to supply sufficient allegations to render his defamation claim plausible.

### B. Breach of Contract Claim

Defendant's arguments as to Beauchene's breach of contract claim will be reviewed under the motion for summary judgment standard.

Beauchene's breach of contract claim grows out of MC Law's alleged failure to give him notice of his alleged violations prior to the meetings he held with Steffey and other members of the faculty. Because he had no notice, Beauchene contends that "he was essentially ambushed and unable to adequately defend himself against the allegations of academic misconduct." Complaint, Docket No. 1, at 9. This failure to provide notice, he argues, denied him due process rights which was "contractually promised to him" in MC Law's Student Honor Code. *Id. See*

*also* Docket No. 8, at 5 ("Beauchene was denied the process he was promised by the Honor Code."). He also claims that other acts taken by MC Law in violation of his rights to due process promised to him caused him to suffer damages in the form of lost tuition as well as future damages related to his lack of a law degree and the inability to transfer to another law school to complete his degree. *Id.* at 12.

In challenging the internal decision-making process of academic institutions, students frequently predicate their claims on constitutional due process and contractual theory. *See, e.g.*, *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978); *Senu-Oke v. Jackson State Univ.*, 283 F. App'x 236 (5th Cir. 2008); *Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992); *Henson v. Honor Comm., Univ. of Virginia*, 719 F.2d 69 (4th Cir. 1983); *Slaughter v. Brigham Young Univ.*, 514 F.2d 622 (10th Cir. 1975), *cert. denied*, 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131 (1975).

At the outset, it should be noted that MC Law is not a *public* university; it is a *private* institution. This distinction is crucial: Unlike public universities where policies and procedures regarding forms of academic dishonesty must comport with due process requirements of the Fourteenth Amendment—as students' continued enrollment is deemed a protected property—, those same protections are not available to students enrolled in private colleges and universities. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 837, 102 S. Ct. 2764, 2771 (1982) ("[T]he Fourteenth Amendment, which prohibits states from denying federal constitutional rights and which guarantees due process, applies to acts of states, not to acts of private persons or entities"); *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988) ("Embedded in our Fourteenth Amendment jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause, and private conduct, against which the Amendment affords

16

no shield, no matter how unfair that conduct may be."). Therefore, causes of actions against private colleges are usually limited to only breach of contract claims. *See id*.; *see also Blouin v. Loyola Univ.*, 506 F.2d 20 (5th Cir. 1975); *Slaughter*, at 624.

Courts have exercised reluctance in interfering with the disciplinary procedures and decisions of educational institutions, even where constitutional due process rights are guaranteed. *See*, *e.g.*, *Senu-Oke v. Jackson State Univ.*, 521 F.Supp.2d at 559 (declaring that "the Supreme Court and Fifth Circuit have made clear that the process which must attend student dismissals, whether for academic or disciplinary reasons, is minimal."), *aff'd per curiam*, *Senu-Oke v. Jackson State Univ.*, 283 F. App'x 236 (5th Cir. 2008); *Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528, 534 (2000) ("In many instances, elements of the law of contracts have been applied to the student-university relationship, but rigid importation of the contractual doctrine has been rejected.") (citing *Corso v. Creighton Univ.*, 731 F.2d 529, 531 (8th Cir. 1984); *Lyons v. Salve Regina Coll.*, 565 F.2d 200, 202 (1st Cir. 1977); *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976); *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir.1975))). Likewise, courts have given considerable discretion to private schools' decisions. *See State v. Schmid*, 84 N.J. 535, 567, 423 A.2d 615, 632 (1980) ("[P]rivate colleges and universities must be accorded a generous measure of autonomy and self-governance if they are to fulfill their paramount role as vehicles of education and enlightenment."); *Ahlum v. Administrators of Tulane Educ. Fund*, 617 So. 2d 96, 98 (La. Ct. App. 1993), *writ denied sub nom.*, 624 So. 2d 1230 (La. 1993) ("A] private institution has almost complete autonomy in controlling its internal disciplinary procedures." (citing *Flint v. St. Augustine High School*, 323 So.2d 229, 233 (La.App. 4th Cir. 1975), *writ denied*, 325 So.2d 271 (La. 1976))).

When reviewing dismissals that are academic in nature (such as plagiarism), as opposed to disciplinary dismissals, academic institutions are given even more discretion. *See Hughes*, 765 So. 2d at 534 ("A disciplinary dismissal requires that the student be given oral or written notice of the charges and evidence against him and the opportunity to present his side of the story. . . . In contrast, an academic dismissal calls for far less stringent procedural requirements." (citations omitted)); *Salcido v. Univ. of S. Miss.*, 2:11cv173, 2013 WL 2367877, at *4 n.2 (S.D. Miss. May 29, 2013) (university faculties must have the widest range of discretion in making judgment as to the academic performance of students and their entitlement to promotion or graduation because a graduate or professional school is the best judge of its students' academic performance and their ability to master the required curriculum). In *Mahavongsanan*, the Fifth Circuit Court of Appeals sheds light on the difference of treatment for actions that breach academic standards and those that breach standards of conduct:

> Misconduct and failure to attain a standard of scholarship cannot be equated. A hearing may be required to determine charges of misconduct, but a hearing may be useless or harmful in finding out the truth concerning scholarship. There is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals.

529 F.2d at 450. To be clear, "[a] student dismissed for academic reasons is not entitled to any type of due process hearing, and all that is required for disciplinary actions is an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.'" *Senu-Oke*, 521 F.Supp.2d at 559 (quoting *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001) (quoting *Horowitz*, 435 U.S. at 85-86)). There is no question that in MC Law's Honor Code, plagiarism is a form of academic misconduct. Indeed, it falls under Section VIII of the Honor Code entitled, "Types of Academic Dishonesty and Misconduct." Docket No. 4-4, at 4.

Having been called to review MC Law's actions, this Court must determine whether MC Law's procedures were carried out with fundamental fairness so as to ensure that the decisions rendered were not arbitrary and capricious. *See Hughes*, 765 So.2d at 535; *see also Ahlum*, 617 So. 2d at 99 ("The disciplinary decisions of a private school may be reviewed for arbitrary and capricious action." (citations omitted)). In balancing the Court's interest in safeguarding students from unfair procedures that result in arbitrary or capricious decisions, with the importance of giving judicial deference to an academic institution's decision-making process, the Court may look to the degree in which MC Law deviated from its established procedures and whether there was substantial evidence to support its decisions. *See Napolitano*, 186 N.J. Super. at 548; *Ahlum* 617 So. 2d. at 99 (stating that a decision is capricious when it is made "without substantial evidence" and arbitrary when it disregards the weight of evidence); *Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.*, 392 Pa. Super. 502, 511, 573 A.2d 575, 580 (1990). *But see*, *Clayton v. Trustees of Princeton Univ.*, 608 F. Supp. 413, 439 (D.N.J. 1985) (holding that with good reason, a deviation from its procedures will not trigger judicial intervention).

Beauchene asserts that the Student Honor Code formed a contractual agreement which guarantees "contractual" due process rights, the terms of which were violated by MC Law. In assessing such claim, the proper inquiry before the Court then is whether in Mississippi, an Honor Code constitutes a recognizable contract between a private university and its student. If not, the Court would be compelled to dismiss Beauchene's claim for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Federal Procedure. If, on the other hand, the agreement is contractual, the Court must analyze whether MC Law's procedures were fundamentally fair and whether Beauchene's suspension and expulsion were not arbitrary or capricious.

Mississippi law recognizes an implied contractual relationship between a university and its students. *See Hughes*, 765 So. 2d at 535. Pointing to the general law of other jurisdictions, the Mississippi Supreme Court in *Hughes* insisted "that the student-university relationship is contractual in nature and that the terms of the contract may be derived from a student handbook, catalog, or other statement of university policy." *Id.* (citing *Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992); *Doherty v. S. Coll. of Optometry*, 862 F.2d 570 (6th Cir. 1988); *Corso v. Creighton Univ.*, 731 F.2d 529 (8th Cir.1984); *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976); *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108 (Minn. 1977); *Bleicher v. Univ. of Cincinnati Coll. of Med.*, 78 Ohio App.3d 302, 604 N.E.2d 783 (1992); *University of Tex. Health Science Ctr. at Hous. v. Babb*, 646 S.W.2d 502 (Tex.Ct.App. 1982)). [14]

In *Hughes*, a former medical student brought an action for breach of contract against the University of Mississippi Medical Center (UMC), because he was dismissed for failure to pass the first step of the United States Medical Licensing Examination (USMLE). 765 So.2d at 531. Plaintiff argued that, upon matriculation, passing the USMLE was not a requirement for promotion to the School of Medicine or for graduation; thus, the University's alteration of promotion and graduation requirements and Hughes' dismissal for not meeting those requirements constituted a breach of contract, the terms of which were "set out in the catalog then in force at the time of his admission." *Id.* at 533. Instead of dismissing the student's claim, the court found that "the student-university relationship is contractual in nature and that the terms of the contract may be derived from a student handbook, catalog, or other statement of university policy." *Id.* at 534. However, following the Fifth Circuit's holding in *Mahavongsnan*, the court ultimately ruled in favor of UMC on the contractual claim. *Id.* It stated, "while the student-

---

[14] Although *Hughes* deals with a public university and its students, this holding that recognizes implied contractual relationships between the student and his or her university is equally applicable to private academic institutions.

university relationship is contractual in nature, implicit in the university's general contract with its students is a right to change the university's academic degree requirements if such changes are not arbitrary or capricious." *Id.* (citing *Mahavongsnan*, 529 F.2d at 450).

In his Complaint, Beauchene argues that MC Law breached the due process rights guaranteed to him in the Student Honor Code in the following ways: (1) they did not provide him with notice of the alleged violations prior to both the March 9, 2012, and October 24, 2012, meetings in violation of Section X(B)(3) of the Student Honor Code, Docket No. 1, at 9; (2) at the meetings, he was not provided with "a summary of the information gathered" from the school, he was denied "a reasonable opportunity to respond," and he was not provided an explanation of the disciplinary procedures in violation of Section X(B)(4), *id.* at 9-10; (3) MC Law gave him false information about his right to have a witness available, and he was prohibited from having one in violation of Section X(B)(5),[15] which stunted his ability to defend himself adequately, *id.*; and (4) MC Law denied him the right to appeal, a right promised in Section XI(A), *id.*

> 1. *Beauchene's accusation that he was not provided notice prior to his meetings pursuant to Section X(B)(3) of the Student Honor Code*

Rule X(B)(3) provides the procedures that must follow after the Honor Code Advisor determines that there is a sufficient basis to believe a violation has occurred:

> If the Advisor concludes that a sufficient basis exists to believe that the accused violated the Honor Code, then the Advisor will promptly notify the student, in writing, of the alleged violation, will set a time to meet with the student in person, and will gather any other information needed to resolve the matter.

---

[15] Section X(B)(5) states, "During the meeting with the student, both the Advisor and the student may – but need not – have witness available. However, the witnesses need not be in the same room as the student, and the student, while having the right to understand the witnesses' testimony, does not have a right to examine the witnesses or know their identity. The Advisor may choose to record the meeting."

Docket No. 1-1, at 58. The record shows that before Beauchene's initial meetings with Steffey, he was not provided notice, "in writing," of his violations as established in MC Law's Honor Code. Indeed, before being notified of the first accusation of plagiarism in the March 9 meeting, Beauchene inquired about the nature of their meeting so that he may prepare, but Steffey withheld information about the meeting from Beauchene, telling him that there was no need to worry about it. *Id*. at 2.

Although Beauchene was not given notice before these initial meetings, this deviation alone did not make MC Law's procedures unfair. While Beauchene was accused of plagiarism at these meetings, he was put on notice of his violations and he was given the opportunity to have additional meetings with Steffey to discuss his violations prior to any sanctions being imposed. *See id*. at 15, 35. After the initial meeting on March 9 (which lasted more than two hours), for example, Beauchene and Steffey met again on March 20. That second meeting followed several exchanges of emails and other written communications between Steffey and Beauchene concerning the plagiarism allegations. At those meetings, they fully discussed the plagiarism allegations, and Beauchene was allowed to present information and offer explanations. Additionally, Steffey also informed Beauchene of the "presumptive sanctions for plagiarism." In total, all meetings between Steffey and Beauchene lasted nearly six hours. *Id*. at 8.

Similarly, with respect to the investigation of the second charge of plagiarism, Beauchene engaged in multiple communications, verbal and email, with his Professor and Steffey concerning the second charge of plagiarism. After his meeting on October 24, Beauchene was provided a second meeting with Steffey on October 29 to discuss matters, *see id*. at 42, and, on November 5, he met with Dean McIntosh and Professors Edwards and Steffey. *Id*. at 43. Notably, these meetings were held before any sanctions were imposed. Thus, the meetings and

other communications between Beauchene and MC Law officials more than compensate for their minor deviations from the Student Honor Code's written procedures.

MC Law asserts that those initial meetings on March 9 and October 24 were part of MC Law's investigation to determine "that a sufficient basis exists to believe that [Beauchene] violated the Honor Code." *Id*. at 58; *see also* Docket No. 5, at 9. Section X(B)(1) of the Honor Code states that Steffey could "interview the person making the referral and other persons with information" during the investigation stage of the accused to determine whether a violation was committed. Docket No. 1-1, at 57. This provision does not prohibit Steffey from interviewing the person being accused of violations during the investigatory stage. Given the fact that Beauchene was afforded additional meetings for his offenses and allowed to plead his case, the Court finds that MC Law gave sufficient notice in substantial compliance with its procedures.

> 2. *Beauchene's accusation that MC Law deviated from procedures set forth in Section X(B)(4) of the Student Honor Code*[16]

Beauchene's accusations that the procedures set forth in Section X(B)(4) were not followed is not supported by the record. In fact, the record shows that the procedures were followed or at least substantially complied with on March 9 and October 24, respectively.

In the March 9 meeting, for example, Beauchene and Steffey discussed Beauchene's violations of the Student Honor Code for over two hours. Steffey explicitly explained to him the

---

[16] Section X(B)4 states,

> At the meeting with the Advisor the student will be provided with (a) an explanation of any Honor Code section at issue and the nature of the conduct underlying the accusation; (b) a summary of the information gathered; (c) a reasonable opportunity to respond; and (d) an explanation of the applicable disciplinary procedures.

Docket No. 1-1, at 58.

source of his plagiarism (which was clearly evident), and pointed out to him specific examples in his paper where he used someone else's work without giving them credit. More specifically, Steffey told Beauchene that the "first 25% of [his] paper…[was] taken line-by-line and footnote-by-footnote from a single source (Miranda Anger, *International Aviation Safety: An Examination of the U.S., EU, and the Developing World,* 72 J. Air L. & Com. 141)." *See* Docket No. 1-1, at 7. Beauchene was given the chance to respond several times during the meeting, yet he evaded accepting responsibility until he finally confessed to his wrongdoings in his March 15, 2012, email to Dean Rosenblatt.[17] This confession came after Beauchene and Steffey met on at least two prior occasions and, at each of those meetings, Beauchene had an opportunity to respond to the allegations.

In addition, Beauchene was given multiple opportunities to have his paper reviewed by professors from another law school—an option not mentioned in the terms of the Honor Code and thus another added benefit made available to Beauchene—or to seek review by the Honor Court. He chose neither path. Beauchene was also apprised that he would fail the course and face additional sanctions if the findings of Nicoletti and Steffey that Beauchene engaged in plagiarism were sustained.

In similar fashion, during the October 24 meeting, Beauchene was told that long passages of his paper were taken, verbatim, from an uncited internet source. Docket No. 1-1, at 39. He was given the opportunity to respond and explain his errant behavior. His response included an admission that he copied and pasted information from the internet onto his paper. As a student on probation, the rules for his readmission and subsequent matriculation were quite different. As

---

[17] Despite compelling evidence to the contrary, Beauchene, in his reply, claims that he never admitted to plagiarism. The record clearly shows otherwise.

explained in the Memo to Beauchene dated April 3, 2012, his probationary status made him subject to immediate expulsion should he ever violate the Honor Code again. Docket No. 1-1, at 24. Even as a student who had been stripped of the protections of a regularly enrolled student, Beauchene was allowed to meet with the Dean.[18] Therefore, he received more protection and process than that which he was entitled. Thus, contrary to plaintiff's arguments, MC Law met the requirements of Section X(B)(4).

> ### 3. Beauchene's accusation that he was denied rights outlined in Section X(B)(5) of the Student Honor Code[19]

Beauchene's third argument that he was prohibited from having witnesses available is also inaccurate. As Steffey stated in a March 30 email to Beauchene, Beauchene never actually exercised his right to have a witness present or have witness testimony heard during the investigation and review of his first offense. Docket No. 1-1, at 17. Nothing in the record contradicts this point.

During the process of investigating the second offense, Beauchene inquired of Steffey whether he may have a professor present, Docket No.1-1, at 31, but he never really received a definitive answer from Steffey. *Id*. However, he was never specifically prohibited from

---

[18] Since Beauchene was notified of this fact and he admitted to plagiarism, the Court finds that he was actually given more process than he was owed.

[19] Section X(B)(V) provides:

> During the meeting with the student, both the Advisor and the student may – but need not – have witnesses available. However, the witnesses need not be in the same room as the student, and the student, while having the right to understand the witnesses' testimony, does not have a right to examine the witnesses or know their identity. The Advisor may choose to record the meeting.

Docket No. 1-1, at 58.

discussing matters with his professors during the process of investigating his second offense, nor was he denied the right to have a professor present. *Id*. at 34.

Even if MC Law explicitly told Beauchene that he could not have any witness present, this fact would be inconsequential. It is clear from the record that Beauchene submitted work without attribution to the actual authors. His plagiarism was blatant and pervasive, and he admitted as much.[20] Therefore, having a witness present would have been fruitless and would not have altered the outcome of Beauchene's dismissal.

> 4. *Beauchene's accusation that he was denied his right to appeal as promised in Section XI(A) of the Student Honor Code*

Finally, Beauchene argues that he was denied his right to appeal MC Law's decisions. Section XI(A) of the Student Honor Code states that "[a] student who has been sanctioned by the Advisor may, as of right, appeal the sanction and the Advisor's findings to the Honor Court." *Id*. at 59. Before Beauchene was suspended for his first violation, the record shows that he was given numerous opportunities to have the matter reviewed by an Honor Court. Beauchene outright refused to do so. Docket No. 1-1, at 3. Moreover, he admitted that he understood that he had violated the Honor Code, accepted the sanctions, and completed the tasks necessary for his readmission. *Id*.; Docket No. 4-11.

---

[20] Having admitted to the charge, Beauchene may have forfeited his right to due process. *See Anvar v. Regents of Univ. of Calif.*, 2005 WL 2789331, at * 6 (Cal.App. 2 Dist. Oct. 27, 2005) ("a student may not assert that his due process rights were violated after admitting the conduct on which the discipline is based) (citing *Keough v. Tate County Bd. of Educ.*, 748 F.2d 1077, 1083 (5th Cir. 1984)). Although this principle stems from cases dealing with constitutional due process rights in public universities, it may be applied to contractual due process rights in private colleges as well. Here, the Court does not rule that Beauchene is not owed fundamentally fair procedures simply because he admitted to his violations; however, the Court does find that his admission, along with the procedures given, gave credence to MC Law's decisions.

In October, Beauchene sought to appeal his expulsion, but the appeal was denied. Although Beauchene was denied his right to appeal his expulsion, that decision was not arbitrary or capricious. The decision to revoke his probationary status was not subject to further review as a matter of right. Docket No. 1-1, at 41. By meeting with Beauchene before the expulsion, however, the Dean actually provided Beauchene more process than that to which he was entitled.

Here, MC Law denied Beauchene's appeal. Nothing in the Honor Code or the law prohibits the school from denying the appeal to a probationary student who was found to have committed the same violations that transformed the student to a probationary student. In other words, that action cannot be deemed arbitrary and capricious. In *Hughes*, for example, while recognizing the deference with which courts have given to academic institutions, the court stated that UMC possessed the implied authority to change the requirements for graduation as long as that change was not arbitrary and capricious. *Id.* at 534 ("Implicit in the student's contract with the university upon matriculation is the student's agreement to comply with the university's rules and regulations, which the university is entitled to modify so as to properly exercise it educational responsibility." (quoting *Mahavongsnan*, 529 F.2d at 448)).

The Court has already noted the significance of Beauchene's admission of guilt, *see supra*, n. 20. However, even if he did not admit to plagiarism, based on the Court's own review of the record, Beauchene's plagiarism both in the Spring of 2012 and the Fall of 2012 is overwhelmingly apparent. *See* Docket No. 4. Consequently, as the defendant argues in its Motion for Summary Judgment, it was not necessary for an appeal-like procedure for the same reason it is not necessary for this Court to allow Beauchene's claim to proceed: the determination

of plagiarism can be made from the record alone. [21] *See Horowitz*, 435 U.S. at 90 (holding that it is not necessary for a hearing to be held for a dismissal that is academic in nature). The degree to which Beauchene plagiarized was so egregious that a finding to the contrary would be tantamount to an abuse of discretion.

The first time Beauchene plagiarized in the Fall semester of 2012, he wrote a letter to Steffey explaining that the footnotes of the Anger article from which he copied onto his research paper "referred to preceding notes that did not exist in [his] paper and stated, incorrectly, that [he] had visited the reference website in 2006." Docket No. 4-11. Similarly, Beauchene's plagiarism was so pervasive in his second submission that one example revealed that he copied errors of misspellings from the original author's text. *See* Docket No. 5, at 23. These sorts of violations cannot be dismissed as mere mistakes made in haste; they present iron-clad proof of plagiarism.

The due process afforded to Beauchene was, at the very least, commensurate with the academic violations that he committed. He was given an opportunity to be heard, notice that he would be disciplined for his violations, a detailed explanation as to why he would be punished, and even an opportunity to be readmitted in substantial compliance with the established rules at MC Law. Beauchene has no proof that a different result would have been produced had he been afforded any of the due process purportedly denied to him, such as the opportunity to have been supplied with written notice of the charges and the opportunity to call witnesses at his meetings with Steffey and his professors. Even under the "informal give-and-take" requirement applied to dismissals for academic reasons under the constitutional due process analysis in *Senu-Oke*, the

---

[21] MC Law attached to its Motion for Summary Judgment exhibits containing Beauchene's research paper submissions with copies of the original source's from which he copied with the intent to represent it as his own work.

Court could still reasonably conclude that Beauchene was afforded all the process to which he was entitled, and beyond: he was given numerous opportunities to explain his actions in writing and in several face-to-face meetings with the proper administrative authorities so that he could "characterize his conduct and put it in what he deem[ed] the proper context." *Id*. at 559. In light of these factors, combined with the practice of judicial nonintervention when reviewing academic dismissals, and the broad discretion with which private schools are vested, in general, the decision to suspend Beauchene and ultimately expel him was not arbitrary and capricious.

An educational institution's decision to suspend or punish a serial plagiarist within the law school context has special implications. *See generally Plagiarism*, 37 J.C. & U.L. at 75 (stating that a finding of plagiarism may call into question the student's moral character and fitness to engage in the practice of law and can "potentially thwart a law career at the admission-to-the-bar level"). Courts exercise judicial restraint in the academic context so as not to stifle academic freedom and interfere with the unique relationship inherent between the student and his or her school. As the United States Supreme Court explained in *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225-26 (1985):

> When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment. Considerations of profound importance counsel restrained judicial review of the substance of academic decisions.
>
> . . . . Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students. . . but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself.

*Id*. (footnotes and citations omitted).

The more specialized and individualized the educational regime, the more unique that relationship becomes and the more deference an institution should be given when dismissing a student for academic reasons. *See Horowitz*, 435 U.S. at 90 (explaining the importance of deferring to educators in dealing with academic dismissals, claiming that this is especially critical when educational regimes become more "individualized" and "specialized"). Of greater significance is society's need to be protected from individuals entering the legal field without sound skill, competence, and moral aptitude. Along these lines, law schools are in a noteworthy position (and are somewhat obligated) to shield society by holding their students to certain academic and moral standards as a requirement to continue their legal education and receive a Juris Doctor diploma.

Beauchene's multiple violations of plagiarism exhibit gross academic and ethical behavioral deficiencies. It is he who breached the contract he had with the law school; as he was obliged to comply with MC Law's Honor Code, but he failed miserably.

On this record, there can be only one conclusion: Beauchene engaged in widespread plagiarism in violation of MC Law's Honor Code, and the procedures extended and provided to him during the investigation of those charges were fundamentally fair. Neither the decision to suspend him nor to expel him was arbitrary and capricious.

In all respects, the Court finds that MC Law acted appropriately.

### IV. Conclusion

For these reasons, the Defendant's Motion to Dismiss, or in the alternative, Motion for Summary Judgment is hereby GRANTED. All Plaintiff's claims, including his Motion for Preliminary and Permanent Relief, is DENIED.

**SO ORDERED**, this the 8th day of November, 2013.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE